STATE *vs.* THOMAS J. HEFFERNAN.

JUNE 16, 1906.

PRESENT: Douglas, C. J., Dubois, Blodgett, Johnson, and Parkhurst, JJ.

(1)  *Indictments.   Practice of Medicine.*

The words "practice of medicine," as used in Gen. Laws, cap. 165, must be construed to relate to the practice of medicine as ordinarily and popularly understood, having relation to the art of preventing, curing, or alleviating disease or pain. If the acts shown by the evidence amount to the practice of medicine as meant by the statute, a defendant is not protected by his claim of ignorance of any or all of the learning which is necessary for the safe and successful treatment of disease or by his disclaimer or assumption of any kind or number of titles.

Evidence considered, and

*Held*, that the acts of the defendant amounted to the practice of medicine in violation of Gen. Laws, cap. 165, as amended by Public Laws, cap. 926.

(2)  *Evidence.*

Upon an indictment for the illegal practice of medicine, the opinion of a witness as to what constitutes the practice of medicine is immaterial and properly excluded.

(3)  *Evidence.  Secret Process.*

Upon an indictment for the illegal practice of medicine, the State may properly inquire of the defendant as to the ingredients of the "nerve food" administered by him, the consideration of trade secrets being secondary to the public rights involved.

(4)  *Practice of Medicine.  Indictments.*

The statutes relative to the practice of medicine are intended to protect the public from pretence and sham, as well as from ignorance; and therefore if a defendant prescribes or administers something which he claims alleviates pain or cures disease, it can not avail him to show in defence that what he administered did not have the qualities claimed for it.

INDICTMENT. Heard on exceptions of defendant to ruling of Superior Court, denying new trial, and exceptions overruled.

JOHNSON, J. An indictment was found against the defendant, on the 18th day of September, 1905, which charged that the defendant on the first day of April, 1904, and thence continuously until the day of the finding of the indictment, at Providence, " did practice and attempt to practice medicine and surgery and the branches of medicine and surgery with intent to receive compensation therefor directly and indirectly, the said Thomas J. Heffernan not having then and there first obtained a certificate from the State Board of Health and not being then and there lawfully authorized to practice medicine within this State and not being then and there lawfully registered to practice medicine within this State in accordance with the provisions of section two of chapter 165 of the General Laws, against the form of the statute in such case made and provided."

To this indictment the defendant pleaded not guilty, and upon trial in the Superior Court was found guilty.

The case is before us upon his bill of exceptions to the decision of the justice who presided at the trial, denying his motion for a new trial, based upon the grounds:

1. That said verdict was contrary to the evidence.

2. That said verdict was contrary to the law.

Section 2 of chapter 165 of the General Laws, in part, is as follows: "It shall be unlawful for any person to practice medicine or surgery in any of its branches, within the limits of

this state, who has not exhibited and registered in the city or town clerk's office of the city or town in which he or she resides, his or her authority for so practicing medicine as herein prescribed, together with his or her age, address, place of birth, and the school or system of medicine to which he or she proposes to belong."

Section 3 of said chapter, as amended by chapter 926 of the Public Laws passed November 26, 1901, is, in part, as follows: "Sec. 3. Authority to practice medicine under this chapter shall be a certificate from the state board of health, and said board shall, upon application, after examination, issue a certificate to any reputable physician who intends to practice medicine or surgery in this state and who shall present himself before the state board of health and pass in a satisfactory manner such examination as said board may require."

Section 8 of said chapter, as amended by said chapter 926 of the Public Laws, is as follows:

"Sec. 8. Any person who, not being then lawfully authorized to practice medicine within this state, and so registered according to law, shall practice medicine or surgery or attempt to practice medicine or surgery, or any of the branches of medicine or surgery, after having received therefor or with the intent of receiving therefor, either directly or indirectly, any bonus, gift, or compensation, or who shall open an office with intent to practice medicine or shall hold himself out to the public as a practitioner of medicine, whether by appending to his name the title of doctor or any abbreviation thereof, or M. D., or any other title or designation implying a practitioner of medicine, or in any other way, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined fifty dollars, and upon each and every subsequent conviction shall be fined one hundred dollars and imprisoned thirty days, either or both, in the discretion of the court; and in no case when any provision of this chapter has been violated shall the person so violating such provision be entitled to receive compensation for services rendered."

For the State, Dr. Gardner T. Swarts, secretary of the State Board of Health, testified that he has charge of the registration

of physicians in this State; that the defendant is not registered under the laws of the State and was not so registered during the period from April 1, 1904, to September 18, 1905; that said defendant had an office in the Studley Building on Weybosset street, in the city of Providence; that the name "Dr. Heffernan" was on the door; that there was also a door label with the words: "Dr. Thomas Heffernan, Doctor of Dermatology and Physical Education."

Certain printed advertisements were put in evidence, Exhibit A. stating that "Dr. Heffernan has opened offices at 86 Weybosset street, Providence, R. I., for the practice of Dermatology and Physical Education, in the cure of every and all manner of disease on the inside or outside of the human body. He is also authorized by law to teach this science of healing to students aspiring to become nurses and doctors. Diplomas are grantable by the Heffernan Institute to such as are competent to practice the science. His hours for free public consultations are from 12 to 5, week days only. Special appointments may be made at his office by mail or telephone for treatment at the office or residence outside of office hours."

Exhibit B. states: "Dr. Heffernan has always held that so-called disease is nothing but the result of nervous impediments, and he has proved it in ten thousand cases right here in Rhode Island. Here they are,"—it then enumerates a large number of cases of various diseases, and says: "The last case of consumption was cured in 22 days. Consultation and advice absolutely free. The only charge is for Electro-Magnetic Nerve Food and work done. Dr. Thomas J. Heffernan, Dermatologist, Physical Educator, Nerve Specialist, 86 Weybosset St., Providence."

The defendant admits that these advertisements were published by him.

Mary Buckley testified that she went to the defendant with her nephew, William Buckley, in November, 1904, at the solicitation of Mrs. Faulkner. She says the defendant examined him, "and I don't know what you would call it, something to test your lungs with, with a strap around him, and he said he was very badly with consumption and I don't really

remember whether he did anything to him that day, or not, but he gave him some medicine to bring home, and he told me that it would cost me $100 to get him cured, and he said he would cure him in three months, have him so he would be able to work in three months time, and he charged me four dollars for the first four bottles of medicine I got." She said William Buckley went to the office three times, that the defendant stripped him every time, and one time he put some stuff in his ear, and gave him some stuff to put in his mouth and rubbed him round the chest and ears and head with this medicine; that he gave him medicine to take home to drink; that he did not go to the house but said he would if it was necessary; that she went to the office five times; that she got sixteen bottles of nerve food in all and paid the defendant $16. That defendant told her the rule was that when he made any special treatment in the office it was a dollar extra.

Margaret Ryan testified that she went to see the defendant at the solicitation of Mrs. Faulkner; that she had a skin disease; that the defendant salved her body with this food; that after the treatment he said he could cure her and that he didn't see how he could afford to do it at less than five dollars for the massaging and the food; that she went to the office until she had received twenty-five treatments for which she paid him $5 a treatment, amounting in all to $125. She then stopped going to his office. She said: "The last treatment I took at his office he had to use something in my ears. The next day I was in a critical condition. I was not able to go to his house so I was obliged to send for him to come to see me at my home. He came there and brought some medicine and treated me there, my head and shoulders, and I was not able to go to his office any more. He made three visits there."

The following receipt was put in evidence:

"Providence, R. I., January 16, 1905. Mrs. Margaret Ryan, Dr., to Thomas J. Heffernan, Doctor of Dermatology and Physical Education, Office 86 Weybosset street, Treasurer, Heffernan Institute, Incorporated: For professional services rendered 25 treatments at 5.00—$125.00. Received Payment, Thos. J. Heffernan. Office Hours, 12 to 5 P. M."

The defendant admitted receiving the $125 and giving said receipt. He sent a bill to Mrs. Ryan for professional services rendered at her home, amounting to $20. This bill was not paid.

Lewis A. Hall, a police officer, testified that he went to the defendant's office, March 25, 1905; that he asked him if he was Dr. Heffernan and he said he was; that he asked him if he had any nerve food and he said he had; that he showed him three different bottles and asked what was the matter with him; that he told him he had catarrh; that he then took him into a side room, had him strip off to the waist, examined him on the lungs and chest, took his chest expansion, showed him three bottles, Nos. 1, 2, and 3, and said if he would take No. 3 bottle and rub it on his forehead, back of his neck and nose, it would kill the catarrh; that he asked the price and the defendant said it was a dollar, and he paid him a dollar.

The defendant testified that he is a doctor of dermatology and physical education; denied that he had ever practiced medicine or held himself out as a medical doctor, and said that he had never applied to the board of health for a certificate. When asked if he had any authority for the practice of dermatology and physical education, he said: "I have a certificate from the State in the form of a charter." He then introduced a certificate of the secretary of state that certain persons, of whom the defendant was one, "have filed in the office of the secretary of state, according to law, their agreement to form a corporation under the name of Heffernan Institute of Dermatology and Physical Education, of the United States of America, for the purpose of promoting, teaching, and practicing the science of Dermatology and Physical Education according to the principles developed and taught by Thomas J. Heffernan, the inventor of Nerve Food, aiding and caring for sick and infirm people, especially those afflicted with consumption and similar loathsome nervous diseases, encouraging temperance and such other habits as tend to the physical health, long life, and happiness of mankind, in accordance with law, and have also filed the certificate of the general treasurer that they have paid into the general treasury of the state the fee required by law."

He testified that he had been interested in the manufacture of nerve food for five years, that he had given it all his time since about June, 1905, that prior to that time he had given it very little of his time, attending to it evenings occasionally, but not regularly; that he had other occupation, as president of a life insurance company; that he had been engaged in life insurance about eleven years, as agent in part, and president; that prior to that he had been in the market and grocery business; that he had no medical education, never attended any medical school or took any course of studies in medicine; that he discovered the nerve food about five years ago; that it is composed of herbs and fruit entirely; that the nerve food also contains neuzoid, which is made from grasses imported from Japan and other places; that he discovered the use of neuzoid in connection with the other ingredients; that he gets a royalty from the sales of nerve food. He further testified: "C. Q. 190. You notice in your handwriting '25 treatments, at $5, $125.' You yourself have used the word 'treatments,' and it is written in there in your own handwriting; why did you use that word? Ans. That means the amount of food that was used on her. C. Q. 191. You mean that the word 'treatment' was the proper word used when you meant so many ounces of nerve food? Ans. Yes. . . . C. Q. 201. In connection with your profession you do use the title 'Doctor,' do you not? Ans. I do. . . . C. Q. 204. What significance does that word 'Doctor' have? Ans. Nothing more than teacher. C. Q. 205. You used the word in your direct examination as 'general practitioner;' general practitioner of what? Ans. Dermatology and physical education."

As to the treatment of Mrs. Ryan, he testified that he sold her the "food" and rubbed it on her head and body, and on one occasion put some in her ear; that he used at one time eight ounces, and at other times sixteen ounces at a treatment; that the "food" was worth seventy-five cents an ounce.

As to William Buckley, he testified: "I had him remove his clothing on the upper part of his body, including his shirt. I took some nerve food and applied it to his body, showed him

how he might use it at his house. I gave him a lesson in breathing. He was unable to take any air into his lungs. His chest was entirely neutral. I explained to him how to breathe and I assisted him to take some pus from his nose, got him so that, the second time he called to the office, he was able to expand his chest from nothing to three inches. He was a great deal improved in his health that time he left off treatment."

Mary J. Faulkner, called by the defendant, testified that she brought patients to the defendant's office; that she brought Mrs. Ryan and Mrs. Buckley there; that she received a commission from the defendant each time for the patients she brought; that she caused William Buckley to go there; that the defendant examined him; that he took off the clothing from his chest, sounded his chest, measured his chest, and asked him to breathe; that he told him he was not breathing properly, told him how to breathe, told him what clothing he should wear, told him what amount of nerve food he should use and how to apply it; that one kind was to be rubbed on the face and head, and the other was to take internally; that the defendant told her to bring people to his office having consumption, asthma, skin diseases of all kinds, catarrh, indigestion, and almost every disease she could think of. She said she was present twice when William Buckley was at defendant's office; that the defendant both times stripped his chest and examined it, measured it, sounded his lungs, and gave him instructions as to what to do; that Buckley was in a very weak condition and could scarcely walk from the car to the office, and that he died a few weeks after the first treatment.

Did these acts of the defendant amount to the practice of medicine, in violation of chapter 165 of the General Laws, as amended by chapter 926 of the Public Laws, passed November 26, 1901?

(1)     In *State* v. *Mylod*, 20 R. I. 632 (p. 637), this court said: "Medicine, in the popular sense, is a remedial substance. The practice of medicine, as ordinarily or popularly understood, has relation to the art of preventing, curing, or alleviating disease or pain. It rests largely in the sciences of anatomy, physiology, and hygiene; it requires a knowledge of disease,

its origin, its anatomical and physiological features, and its causative relations; and further, it requires a knowledge of drugs, their preparation and action. Popularly it consists in the discovery of the cause and nature of disease, and the administration of remedies or the prescribing of treatment therefor."

The words "practice of medicine," as used in Gen. Laws, cap. 165, must be construed to relate to the practice of medicine as ordinarily and popularly understood. If the acts shown by the evidence amount to the practice of medicine, as meant by the statute, the defendant is not protected by his claim of ignorance of any or all of the learning which is necessary for the safe and successful treatment of disease or by his disclaimer or assumption of any kind or number of titles.

A person who testifies that he is not a medical doctor, and states that he never attended a medical school or took any course of studies in medicine, but claims to be a doctor of dermatology and physical education by virtue of an Institute of Dermatology and Physical Education, formed by himself and others under the law relating to incorporation, and who also adds the title "nerve specialist," by some authority not disclosed, is still amenable to the law and capable of practicing medicine in violation of the provisions of the statute.

"The object of the statute in question is to secure the safety and protect the health of the public. It is based upon the assumption that to allow incompetent persons to determine the nature of disease, and to prescribe remedies therefor, would result in injury and loss of life. To protect the public, not from theories, but from the acts of incompetent persons, the legislature has prescribed the qualifications of those who may be entitled to perform the important duties of medical practitioners. The statute is not for the purpose of compelling persons suffering from disease to resort to remedies, but is designed to secure to those desiring remedies competent physicians to prepare and administer them." *State* v. *Mylod, supra,* p. 643.

In *Bibber* v. *Simpson,* 59 Me. 181, the court said: "The services rendered were medical in their character. True, the

plaintiff does not call herself a physician, but she visits her sick patients, examines their condition, determines the nature of the disease, and prescribes the remedies deemed by her most appropriate. Whether the plaintiff calls herself a medical clairvoyant, or a clairvoyant physician, or a clear-seeing physician, matters little."

In *State* v. *Van Doran*, 109 N. C. 864, 870, the court said: "At the request of the solicitor, the court charged the jury that if 'the defendant attended any sick person, examined the condition of such sick person and prescribed the medicine of his own make for the sick person, and held himself out to the public as competent to prescribe the medicine of his own make, in those cases wherein it was the proper remedy in his opinion, and did prescribe it in such cases, the defendant had violated the criminal law' and should be found guilty.

"We think that the instruction embodied the law applicable to the testimony bearing upon the charge. An unlicensed person claiming to be a physician and holding himself out to the world as such, can not, after examining a patient who has asked his services, diagnosing the disease, fixing an amount or price for which he will cure the patient, and giving him a prescription, evade the law by proving that the medicine administered was a proprietary remedy prepared and sold by him."

We are of the opinion that the acts of the defendant shown in the evidence amount to the practice of medicine in violation of Gen. Laws R. I. cap. 165, as amended by chapter 926 of the Public Laws.

The objections taken to cross-questions 49 and 50, page 10, were sustained, and the defendant excepted. The questions, asked of Dr. Swarts, were as follows: "C. Q. 49. Do you consider the selling of nerve food to constitute the practice of medicine?" "C. Q. 50. If a person should buy a bottle of this nerve food and employ some one to rub it upon the body, would you consider that to be the practice of medicine?"

The rulings of the court were correct.

The opinion of the witness as to what constituted the practice of medicine was clearly immaterial.

Objection made to cross-question 51 was sustained, and exception taken. The State, however, immediately withdrew its objection, and the court allowed the question to be asked.

(3) Exception was also taken to the ruling of the court in allowing cross-question 76 (p. 55): "What is the ingredient of this nerve food outside this one particular ingredient?" The defendant's counsel objected, on the grounds: 1. That, while the State had the right to prove the ingredients by its witnesses if it could, it had not the right to find out from the defendant. 2. That the State had not the right to inquire into the composition of the nerve food, because it was the private property of the defendant. The court said: "The first ground is not tenable, in my opinion, because if the defendant takes the stand he is compelled to testify in regard to any proper question. It is his privilege not to take the stand, if he sees fit to avail himself of it; but if he does take the stand, he must answer in regard to any pertinent inquiry. The second point is that this is private property, and in my opinion that is a consideration which is secondary to the public consideration of the right to know what he has been giving. The mere fact that he claimed a secret process does not, in my opinion, relieve him from the duty of answering a proper question, in cross-examination, as to what he has administered, and I sustain the question of the attorney-general and note your objection thereto."

The ruling of the court was correct.

The court was requested to charge as follows: "Defendant is authorized by charter to promote, teach, and practice dermatology and physical education, and to aid and care for sick and infirm people, especially those affected with consumption and similar nervous disease. He can not be convicted of practicing medicine illegally if he did nothing beyond what he was given the right to do under said charter. A person who uses neither drugs, medicine, or surgery can not be said to engage in the practice of medicine."

This request was properly refused. The charter gave the defendant personally no authority to do anything, and what the corporation was authorized to do was, by the very terms of the certificate, to be done "in accordance with law."

The defendant, in order to lawfully practice medicine in this State, would be obliged to obtain a certificate from the State Board of Health. That portion of the request reading, "A person who uses neither drugs, medicine, or surgery, can not be said to engage in the practice of medicine," was properly refused, as it was not applicable to the evidence in the case, and assumed that the nerve food was not medicine. It had been shown that the defendant used nerve food of varying strength; that he claimed that the nerve food was used to supply the capillary nerves of the entire body, and that it was very good for all ailments. The definition of medicine, quoted from *State* v. *Mylod, supra,* would certainly include a remedial substance having the qualities claimed by the defendant for nerve food. If the defendant prescribed or administered something which he claimed was good for the alleviation of pain, or the cure of disease, it would not avail him to show, by way of defence, that what he so administered did not have the remedial qualities which he had claimed for it. The statute was intended to protect the public from pretense and sham, as well as from ignorance.

The defendant's exceptions are overruled.

The defendant attempted, at the trial, to raise the question of the constitutionality of the statute under consideration. In doing so, however, he did not mention any article or section of the constitution of this State or of the constitution of the United States. The constitutional question is not raised with sufficient particularity to justify its consideration by the court.

Case remanded to the Superior Court for sentence.

*James C. Collins, Jr., Assistant Attorney-General,* for State.

*Thomas F. Farrell,* for defendant.